[Civ. No. 51442. First Dist., Div. Five. July 1, 1983.]

SAN JOSE TEACHERS ASSOCIATION et al.,
Plaintiffs and Appellants, v.
ELIZABETH J. ALLEN, as a Member, etc., et al.,
Defendants and Respondents.

628

## COUNSEL

Joseph G. Schumb, Jr., LaCroix & Schumb and La Croix, Schumb, Matteucci & Keller for Plaintiffs and Appellants.

Margaret E. O'Donnell, Breon, Galgani, Godino & O'Donnell and Breon, Galgani & Godino for Defendants and Respondents.

## OPINION

**KING, J.**—In this appeal by school district employees and an employees' organization of the denial of a petition for a writ of administrative mandamus they filed against the school district which terminated the teachers because of a reduction in particular kinds of services, we hold as follows:

1. A preliminary notice pursuant to Education Code sections 44949, subdivision (a), and 44955 recommending that a school district terminate certain certificated employees because of a reduction in particular kinds of services is sufficiently specific if it designates the categories of services to be reduced or discontinued, even though it does not specify the specific positions to be eliminated.

2. Service of the preliminary notice is sufficient if it is in the hands of the post office, correctly addressed, by the statutorily required date of March 15.

3. A school district need not consider positively assured attrition occurring between the date of the preliminary notice and the final notice in determining the number of certificated employees to be terminated by reason of a reduction or discontinuation of a particular kind of service.

■ 4. At the elementary school level, reduction of classroom teaching can be a reduction of a particular kind of service.

■ 5. A school district may consider its financial circumstances in deciding whether to reduce or discontinue a particular kind of service.

■ 6. For seniority purposes, certificated employees who have transferred from a children's center program into the regular program are deemed to have first been employed by the district on the date that they first rendered paid service in a probationary position in the children's center program.

7. When a permanent certificated employee resigns and is reemployed within 39 months, the reemployment restores all individual rights, benefits and burdens of a permanent employee; however, for seniority purposes, the employee does not regain his or her original hiring date.

8. On-call substitutes working on a day-to-day basis do not receive credit for a year's probationary service unless substituting for at least 75 percent of the number of days the regular schools are maintained in a regular school year on other than an on-call day-to-day basis.

■ 9. Specially funded contract employees hired as temporary employees do not acquire probationary status, and may be terminated at the expiration of the contract or specially funded program.

We reverse the judgment to the extent that it upholds the school district's failure to grant former children's center employees seniority credit for such service and affirm the judgment in all other respects.

In the spring of 1979 the Board of Education of the San Jose Unified School District terminated 409 fulltime certified employees pursuant to its determination to reduce particular kinds of services. The San Jose Teachers Association and most of the individual employees filed a petition for a writ of administrative mandamus requesting that the termination and decision be set aside, naming the Governing Board of the San Jose School District and its individual members.

The Education Code provides that a school district may reduce its certificated staff because of a decline in average daily attendance (ADA) or a decision by the school board to reduce or discontinue a particular kind of service (PKS). The code establishes a procedure whereby no later than March 15 of the school year preceding dismissal, the district must give a notice (preliminary notice) to each certificated employee of the decision

recommending he or she not be reemployed for the ensuing year, stating the reasons therefore and the employee's entitlement to a hearing. The hearing takes place before an administrative law judge who prepares a proposed decision which the board may or may not accept. The board's final decision to terminate and notice to the employee of that decision (final notice) must be made by May 15. Any employee not given the preliminary and final notices and the right to the hearing is deemed reemployed for the following year. (Ed. Code §§ 44955, 44949;[1] *Campbell Elementary Teachers Assn., Inc.* v. *Abbott* (1978) 76 Cal.App.3d 796 [143 Cal.Rptr. 281].)

 The preliminary notices in this case gave designations of categories of services to be reduced or eliminated but did not identify the specific positions subject to the notice.[2] Appellants challenge the failure to identify specific positions. Since the March 15 notice is only the initial step in the termination process it is not required that it specify the precise number of teachers to be terminated or the specific positions to be eliminated. The preliminary notice is sufficient if it specifies the statutory grounds set forth in section 44955. The specific positions to be eliminated need not be identified. (See *Santa Clara Federation of Teachers* v. *Governing Board* (1981) 116 Cal.App.3d 831, 841 [172 Cal.Rptr. 312].)

Faced with significant difficulties since the passage of Proposition 13,[3] school districts are placed in the uncomfortable position of having to terminate teachers before knowing what the district's financial circumstances will be for the ensuing school year. This cannot be ascertained until the state budget has been chaptered and the district knows what state funding it will receive.

Thus, the present process requires preliminary notices to be sent by March 15 to all certificated employees who may be terminated and requires the final notice to be given by May 15, even though the school board does not know until the state budget is chaptered late in June exactly what state funding will be available to the district for the ensuing school year. Clearly, the present statutory timetable is unrealistic; however, any changes in that

---

[1] Unless otherwise noted, all statutory references are to the Education Code.

[2] The challenged designations are "Administration (Building and Central Office)," "Categorical Programs," "Counseling," "Department Chairpersons," "Elementary Instrumental Music Program," "Elementary Kodaly Music Program," "Elementary Specialist," "Elementary Vocal Music," "Health Services (Nurses)," and "Library Services (Librarians)."

[3] Proposition 13, passed on June 6, 1978, added article XIII A to the California Constitution limiting the imposition of real property taxes, thereby reducing a major source of revenue for public school districts. Even more importantly, the property tax mechanism had provided a vehicle for assured funding for the ensuing school year. After Proposition 13, a school district must await enactment of the state budget before it knows the funding available for the ensuing school year.

timetable are the responsibility of the Legislature. Although a teacher who is terminated has preferential rights to reemployment under sections 44957 and 87745, this provides little solace to the understandably upset teacher who is given a needless preliminary (and perhaps final) notice because the school district cannot accurately ascertain its financial circumstances for the ensuing school year until the chaptering of the state budget.

One commentator's suggestion on how the Legislature might change the statutory procedure is: "The Legislature should act to streamline the unnecessarily intricate layoff procedures. A single preliminary notice could, for example, replace the present requirement of a March 15 notice followed by an accusation. Such a solution would not adversely affect teachers' rights. Teachers would then need to ask only once for a hearing instead of filing a request for hearing in response to the March 15 letter and a notice of defense in answer to the accusation. [¶] A more radical streamlining would do away with the March 15 and May 15 deadlines entirely and require layoff notices to be sent not later than thirty days after the state budget is chaptered. This approach is a logical response to the post-Proposition 13 school-financing realities. Districts now must rely much more heavily on state financing than in the past, but they do not know by March 15 or even by May 15 the amount of state funding they will receive. Consequently, the number of layoffs that may be necessary also must await the state financing decisions." (See Ozsogomonyan, *Teacher Layoffs in California: An Update* (1979) 30 Hastings L.J. 1727, 1759-1760.)

Appellants next contend that appellant Scott Kanode was not timely served with the preliminary notice and therefore, pursuant to section 44955, cannot be terminated, nor can additional employees in the same assignment with greater seniority. Notice to employees is, under section 44949, subdivision (g), ". . . deemed sufficient when it is . . . deposited in the United States registered mail, postage pre-paid and addressed to the last known address of the employee."

There is no factual dispute as to Scott Kanode. His notice was mailed on March 9, addressed not to his last known address but to his previous address. On March 15, however, the post office placed the correct address on the letter through its computerized forwarding service. Kanode received the letter on March 17. Appellants assert a failure of strict compliance with the statutory mailing provisions as required by *Hankla* v. *Governing Board* (1975) 46 Cal.App.3d 644, 654 [120 Cal.Rptr. 827], both as to timing and because the district itself did not address Kanode's letter to his last known address. *Hankla* is to be distinguished since it involved notice of a dismissal of a teacher for alleged criminal conduct, not a notice of a PKS termination. Former Education Code sections 13405 (present § 44936) and 13406 (pres-

ent § 44937)[4] provide different procedures because a dismissal for misconduct is obviously more serious than a PKS termination.

At oral argument appellants cited *Hoyme* v. *Board of Education* (1980) 107 Cal.App.3d 449 [165 Cal.Rptr. 737] as supporting their position that there must be strict compliance with the statutory mailing requirements. *Hoyme* is also distinguishable since it involved the removal of a principal and her reassignment to a teaching position. ■ There is no statutory limit on the right of the board to remove an administrator for any reason satisfactory to the appointing power and no finding of cause is required. Also, the affected administrator has no entitlement to a hearing. (*Barton* v. *Governing Board* (1976) 60 Cal.App.3d 476 [131 Cal.Rptr. 455].)

■ Section 44949, subdivision (g), sets forth what notice is "sufficient" for an ADA or PKS notice. It does not require that the district itself deposit the notice in the mail addressed to the employee's last known address. It only requires that the notice "be deposited" in the mail and be "addressed to the last known address of the employee." As of March 15, the date required, Kanode's notice was on deposit in the post office and bore his current address. The notice was therefore timely and proper.

Kanode's service of the preliminary notice being sufficient, it is unnecessary to reach the question of whether ineffective service would have precluded not only the termination of Kanode, but all employees in the same assignment with greater seniority. It is contended that a single mistake of this type has a domino effect invalidating dismissals of employees senior to the one mistakenly retained, based upon the provision of section 44955 that "the services of no permanent employee may be terminated . . . while any probationary employee, or any other employee with less seniority, is retained to render a service which said permanent employee is certificated and competent to render."

"Of all the legal questions and problems related to layoffs, the one most crucially in need of resolution is the application of the domino theory." (30 Hastings L.J., *supra,* 1761.) By dicta, *Moreland Teachers Assn.* v. *Kurze* (1980) 109 Cal.App.3d 648 [167 Cal.Rptr. 343] appears to approve the domino theory, but without a thorough analysis of the issue. The Legislature would benefit school districts and teachers alike by specifying whether clerical error requires such a domino effect.

■ Appellants' next contention is that the district, in making PKS reductions, was required to consider all "positively assured attrition" from

---

[4]The Education Code sections were renumbered and the reorganized code became effective April 1977. (Stats. 1976, ch. 1010, § 2, p. 2384; Stats. 1976, ch. 1011, p. 4581.)

the date of the preliminary notice through the date of final notice. This presents an issue of first impression. Courts have previously held that in terminating certificated employees because of a decline in ADA a district must consider all positively assured attrition. (*Moreland Teachers Assn.* v. *Kurze, supra,* 109 Cal.App.3d 648; *Degener* v. *Governing Board* (1977) 67 Cal.App.3d 689 [136 Cal.Rptr. 801]; *Lewin* v. *Board of Trustees* (1976) 62 Cal.App.3d 977 [133 Cal.Rptr. 385]; *Burgess* v. *Board of Education* (1974) 41 Cal.App.3d 571 [116 Cal.Rptr. 183].) "Positively assured attrition" is attrition which has actually occurred and is to be distinguished from "potential attrition" which may be anticipated but is still unknown.

As stated in *Lewin, supra,* "We agree that the board must consider positively assured attrition, such as that which has already occurred in the computation period and mandatory retirements. In our view, however, the board should not be compelled to allocate future resources based solely on projections and estimates of other sorts of potential attrition. Before 15 March of each year the board must make its preliminary determination of the number of permanent employees not to be re-employed for the following year. Board members are not soothsayers. Voluntary retirements, resignations, and deaths may occur—and they may not. Certificated employees cannot have it both ways: they cannot expect to receive early notice of termination and also to limit that notice by yet unknown later events." (62 Cal.App.3d at p. 982.)

As discussed in *Moreland, supra,* 109 Cal.App.3d 648, attrition occurring prior to March 15 has already been considered by the district at the time the preliminary notices are given, whether the layoffs are because of ADA or PKS. In ADA cases it is necessary to take into account the attrition which has occurred during the period in which the ADA decline is measured in order to reduce the number of layoffs that would otherwise be made, because of the mandate of section 44955 that only such reductions as are "necessary" be made. ADA reductions must correspond to the decline in average daily attendance and positively assured attrition must be taken into account through May 15, the date by which the district must give its final notice of termination.

A board's decision as to reduction or discontinuation of a particular kind of service is not tied in with any statistical computation, such as reduction in the number of students. The number of terminations made necessary by PKS reductions depends totally upon the district's decision as to how many services to reduce. Put another way, the language of section 44955 that the governing board of a school district "may terminate the services of not more than a corresponding percentage of the certificated employees of said district" is only applicable to ADA terminations based upon an actual reduc-

tion in attendance. Where the governing board determines to discontinue or reduce a particular kind of service, there is no way to calculate a "corresponding percentage," hence it is within the discretion of the board to determine the amount by which it will reduce a particular service.

*Burgess* v. *Board of Education* (1974) 41 Cal.App.3d 571 [116 Cal.Rptr. 183] construed section 13447 (present § 44955) to limit PKS reductions to those services which a district could totally eliminate. "That narrow construction has not been followed in subsequent decisions. These later decisions have determined that a service, including a specific course offering, which can be reduced but not eliminated is also a particular kind of service as long as a district does not reduce the service below the level required by law." (*California Teachers Assn.* v. *Board of Trustees* (1982) 132 Cal.App.3d 32, 34-35 [182 Cal.Rptr. 754]; see *Rutherford* v. *Board of Trustees* (1976) 64 Cal.App.3d 167 [134 Cal.Rptr. 290]; *Degener* v. *Governing Board, supra,* 67 Cal.App.3d 689 [136 Cal.Rptr. 801].) *Degener,* decided by the same division of the same district which decided *Burgess,* rejected the *Burgess* premise and adopted a standard permitting PKS reductions even though the service could not be totally eliminated so long as the service was not reduced beyond the level required by law. As stated by the court in *California Teachers Assn.* v. *Board of Trustees,* "the reasoning of *Burgess* has never been followed." (132 Cal.App.3d at p. 35.)

Here, it was within the district's discretion, subject to the minimum level required by law, to determine the extent to which it deemed a reduction of services was necessary and proper under the circumstances. (*Krausen* v. *Solano County Junior College Dist.* (1974) 42 Cal.App.3d 394 [116 Cal.Rptr. 833].) This decision is made at the time of the final notice. In PKS cases the determination of the amount by which a service is to be reduced is the determination of the number of positions to be eliminated.

In *Brough* v. *Governing Board* (1981) 118 Cal.App.3d 702 [173 Cal.Rptr. 729], the third and most recent opinion by the same court that decided *Burgess* and *Degener,* one of the issues was whether layoffs under PKS should in any manner affect the normal attrition figures for ADA layoffs. Although used in a different context, the *Brough* court's statement, "Logically the plain terms of section 44955 relating to the positively assured or 'normal' attrition during the computation period do not include PKS layoffs" (118 Cal.App.3d at p. 713), is applicable here. In making a final decision on PKS reductions, the extent to which the services are reduced inherently determines the number of positions to remain. If a service is to be eliminated, for example, it is obvious that it is unnecessary to consider attrition in any way.

■ Appellants' next contention is that reductions at junior and senior high school levels do not constitute PKS reductions because they were preceded and motivated by the district's decision to reduce teaching in general by reducing the number of class periods each day from six to five. As long as there is a change in the method of teaching or in the particular kind of service in teaching a subject, a particular kind of service provided in excess of any statutorily mandated minimum can be reduced or eliminated pursuant to section 44955. (*Campbell Elementary Teachers Assn., Inc.* v. *Abbott* (1978) 76 Cal.App.3d 796, 811-812 [143 Cal.Rptr. 281].) Here, the PKS determination resulted in a reduction of such a large number of courses that the district was able to reduce the number of class periods taught from six to five per day.

Appellants also contend that affected elementary school services were not particular kinds of services because they amounted to a reduction of teaching in general. In making this contention, appellants rely on *Burgess* v. *Board of Education, supra,* 41 Cal.App.3d 571 where the district reduced its staff by increasing class size and pupil-teacher ratios. The *Burgess* court held this was a reduction of "teaching in general" which could not fall within the statutory designation of a "particular kind of service." As previously noted, the same court which decided *Burgess,* in effect, overruled itself by its decision in *Degener.* The *Burgess* decision was based upon the court's erroneous belief that no "particular kind of services" could be reduced unless they were those kinds of services which could be totally eliminated under state law. Since teaching in general obviously could not be totally eliminated, *Burgess* held that teaching in general, without defining the term, was not a "particular kind of service." ■ A school district's decision to reduce a particular kind of service must not be fraudulent, arbitrary or capricious. (*Campbell Elementary Teachers Assn., Inc.* v. *Abbott, supra,* 76 Cal.App.3d 796, 807-808.)

■ Subjects taught in secondary schools and community colleges by designated teachers at particular hours permit easy identification for purposes of PKS reductions. In elementary schools, however, a district cannot easily identify the amount by which particular subjects are to be reduced because many subjects are taught to the same students by the same teacher in the same classroom at unspecified times during the day. Because elementary schools, for the most part, are limited to identifying a service simply as "classroom teaching," this must be recognized as a particular kind of service in order that elementary schools are able to reduce the only services they provide.

Put in another context, "Thus a particular kind of service includes a service or curricular offering which cannot be eliminated, but can be re-

duced to the minimum level required by law. Since high school offerings, such as mathematics, science, history and art, are particular kinds of service, logically elementary grade classes which teach the same offerings, although with a single teacher, are particular kinds of service. Neither the statute nor case law dictate that [elementary] school districts should be precluded from reducing services on an equal basis as high school districts, merely because the former organize their curriculum in a multidisciplinary manner.

"In the present case the 11 kindergarten through sixth grade classes are curricular offerings reduced to a level above that required by law and therefore constitute a particular kind of service.

"Appellants argue that, even if elementary classes are a particular kind of service, reducing the number of classes in order to maintain the same level of service is not the 'reduction' of service required by Education Code section 44955. This contention has been rejected." (*California Teachers Assn.* v. *Board of Trustees* (1982) 132 Cal.App.3d 32, 36 [182 Cal.Rptr. 754].)

At oral argument counsel for appellants acknowledged the conflict between the holdings of *Burgess* and *California Teachers Assn.* and urged us to follow *Burgess.* We find the reasoning of *California Teachers Assn.* to be sound and reject *Burgess.* We therefore hold that classroom teaching at the elementary level is a particular kind of service which is subject to PKS reduction, so long as statutory minimums are maintained.

Appellants also argue that the PKS reductions resulted from the district's consideration of its difficult financial circumstances and that this violated the holding in *Gassman* v. *Governing Board* (1976) 18 Cal.3d 137 [133 Cal.Rptr. 1, 554 P.2d 321]. Although the district denies the terminations were based on its financial difficulties, its concern for its unfavorable financial circumstances is well documented in the record, especially its financial concerns after the passage of Proposition 13. But the *Gassman* decision does not have the ramifications ascribed to it by appellants. *Gassman* dealt with termination of probationary employees for "cause." The court held only that financial difficulties did not amount to "cause" within the meaning of the statute authorizing termination of probationary employees for cause. The court expressly excluded the ADA and PKS statutory provisions from its ruling, since the district had not proceeded under that statute. (18 Cal.3d at pp. 141, 143-144, 147.)

Here, the reduction of particular kinds of services on the basis of financial difficulties was authorized by section 44955. Section 44955 does not pro-

hibit consideration of financial difficulties as the motivation for terminations and, in fact, when adverse financial circumstances dictate a reduction in certificated staff, section 44955 is the only statutory authority available to school districts to effectuate a reduction. As the court in *Gassman* noted, "A school district facing an anticipated unbalanced budget has a variety of means of meeting its financial problems: it may, for example, reduce the number of permanent and probationary teachers pursuant to section 13447 (now § 44955). . ." (18 Cal.3d at p. 147; see also *Campbell Elementary Teachers Assn., Inc.* v. *Abbott, supra,* 76 Cal.App.3d 796, 808 [ADA and PKS reductions by a school district "facing many financial uncertainties" held not arbitrary or capricious].)

Appellants also contend that the district improperly reduced nursing, library and counseling services below statutorily required levels. As to the nursing positions, the trial court was presented with a factual dispute about the number of nurses necessary to provide required services and found in accordance with the evidence supporting the district's position. Conflicts in the evidence are to be resolved in favor of the district as the prevailing party at trial, since the trial court's findings are supported by substantial evidence. (*Pasadena Unified Sch. Dist.* v. *Commission on Professional Competence* (1977) 20 Cal.3d 309, 314 [142 Cal.Rptr. 439, 572 P.2d 53].)

■ Appellants contend with regard to the reduction of library services that the district improperly retained no librarians, although section 18100 states that each school district "shall provide library services" and section 44868 provides that persons employed as librarians shall be credentialed as such. What appellants fail to recognize is that there is no statutory requirement that librarians be employed. The code simply provides that if a librarian is employed, the librarian must be credentialed. Indeed, it has been held that the provisions of section 18120 providing that school districts "may" employ credentialed librarians to staff their libraries does not require a district to employ certificated librarians to provide required library services. (*Campbell Elementary Teachers Assn. Inc.* v. *Abbott, supra,* 76 Cal.App.3d 796, 811.)

With regard to the district's elimination of all junior and senior high school counseling positions, appellants claim error, contending that counselors providing statutorily mandated services for handicapped (an estimated ten percent of the total) must be retained. (See 20 U.S.C. § 1401 et seq.; 34 C.F.R. § 300.13 (1982).) The record indicates that special counseling services would be provided under special contract. As long as the required services will be provided, the district could properly change the manner of their provision and reduce or eliminate the existing particular kind of service

used to provide them. (*Campbell Elementary Teachers Assn., Inc.* v. *Abbott, supra,* 76 Cal.App.3d at pp. 811-812.)

Appellants cite *Santa Clara Federation of Teachers* v. *Governing Board, supra,* 116 Cal.App.3d 831 for the proposition that the nursing, library and counseling positions cannot be eliminated because the same services will be provided by other personnel. In *Santa Clara* the court held that a district cannot effectuate a PKS dismissal and "yet continue the identical kind of service and position held by the terminated employee." (*Id.,* at p. 844, citing *Campbell Elementary Teachers Assn., Inc.* v. *Abbott, supra,* 76 Cal.App.3d at p. 812.) The key to the decision in *Santa Clara* was that the district, as the appealing party, had the burden on appeal of affirmatively showing that the services at issue would continue to be performed but in a different manner, but failed to sustain that burden. (See 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 235 at p. 4225.) Here the employees, as the appealing parties, have the burden on appeal of affirmatively showing that the district would continue identical kinds of services and positions performed and held by the terminated nurses, librarians and counselors. They have not sustained this burden.

■ Appellants also contend that eight appellants who were transferred some time ago from the district's children's center program (see § 8360 et seq.) into the regular program were misclassified as to their years of service for purposes of seniority. The issue is whether prior service in the children's center program must be considered in fixing the first date of paid service in a probationary position. Section 44845 provides, "Every probationary or permanent employee employed after June 30, 1947, shall be deemed to have been employed on the date upon which he first rendered paid service in a probationary position." The trial court determined that the dates of initial service should be based upon commencement of service in the regular program, not the children's center program.

Employees in a school district having an average daily attendance of 250 or more are classified by section 44882 as "permanent" after they have been employed for three complete consecutive school years in positions requiring certification qualifications. Those employees not classified as permanent or substitute employees are classified by section 44915 as probationary employees. By definition, the designation of permanent employees includes children's center employees, as they serve in positions requiring certification qualifications. (§ 8366, see §§ 44004, 44006.) Indeed, since 1976 the Legislature has afforded children's center employees credit for one year of service for purposes of section 44882 where they have performed 134 days of service. (§ 8365.5.)

As "permanent" employees within the meaning of section 44882, the children's center employees come within the provisions of section 44845. Their employment dates are deemed to be the dates on which they first rendered paid service in a probationary position. Because probationary employees include all employees not classified as permanent or substitute (§ 44915), probationary service in the children's center program is to be counted in determining the employees' date of employment pursuant to section 44845. The provisions of the Education Code mandate the credit sought by appellants and the cause must be remanded to the trial court for a determination of the order of seniority of the former children's center employees.

Appellants also contend that the district misclassified two other groups of individual employees for purposes of seniority; however, these contentions lack merit. The first group consists of five individual appellants who attained permanent status, resigned, and then were rehired within 39 months and were not given credit for purposes of seniority for their preretirement employment. If a certificated employee resigns and is thereafter reemployed, his date of employment is normally deemed by section 44848 to be the date of reemployment; however, the original date is effective if the employee's services were "terminated for lack of enrollment or discontinuance of service or are otherwise interrupted in a manner declared by law not to constitute a break in service . . . ." Appellants rely on a combined reading of the latter part of section 44848 and the provisions of section 44931 which state when a permanent employee resigns and is reemployed within 39 months, the district "shall, disregarding the break in service, classify him as, and restore to him all the rights, benefits and burdens of, a permanent employee, except as otherwise provided in this code . . . ." We hold that section 44931 provides that the break in service shall be "disregarded" as to individual rights, burdens and benefits, but not as to seniority rights which affect other employees. The "except as otherwise provided in this code" provision in section 44931 must be read as deferring to section 44848.

The second group of employees appellants claim were misclassified for purposes of seniority were individuals who served as substitutes for more than 75 percent of the days of school years preceding their hiring as probationary employees. The district denied them seniority credit for these years. On this issue, appellants rely on section 44918 which provides for credit for a year's probationary service if such an employee served as a substitute "for at least seventy-five percent of the number of days the regular schools of the district were maintained in such school year *and, has performed the duties normally required of a certificated employee of the school district . . . .*" (Italics added.)

Section 44918 also provides, "Those employees classified as substitutes, and who are employed to serve in an on-call status to replace absent regular employees on a day-to-day basis shall not be entitled to the benefits of this section." Appellants concede that the 75 percent service of each of the members of this second group of employees was at least partially performed in such a day-to-day capacity. They argue that section 44918 should be construed to allow credit for such employees, but this construction is contrary to the express dual statutory requirement of 75 percent service *and* performance of "the duties normally required of a certificated employee."

 Appellants also contend that the district sought to terminate three "Kodaly program" music teachers, but then improperly terminated seven such teachers by misclassifying them as temporary employees not subject to the protections of section 44955. Appellants have not shown where in the record it is demonstrated that the district terminated seven rather than three employees. In any event, the court found that the music program employees had been hired under contract pursuant to section 44909 for a project that was not funded for the ensuing school year. Section 44909 thus permitted their termination "at the expiration of the contract or specially funded project without regard to other requirements of this code respecting the termination of probationary or permanent employees . . . ."

Appellants' final contention arises from the pursuit of a separate mandamus proceeding by one terminated employee, Joyce Baccoccina, in which the trial court remanded the matter for further administrative proceedings on the merits. Appellants contend that the court erroneously failed to render a finding that no junior employees (such as Baccoccina) had been retained, which was essential to validate appellants' terminations under section 44955 under the domino theory. Appellants failed to bring this omission to the attention of the trial court, therefore, it is to be inferred that the court found in favor of respondent district on this point. (Code Civ. Proc., § 634; *Rees v. Department of Real Estate* (1977) 76 Cal.App.3d 286, 291 [142 Cal.Rptr. 789]; *Associated Creditors' Agency* v. *Dunning Floor Covering, Inc.* (1968) 265 Cal.App.2d 558, 559 [71 Cal.Rptr. 494].)[5]

---

[5]The district denies that Baccoccina was retained, and asks this court to take judicial notice of her request for dismissal of her mandamus action. The record fails to disclose whether Baccoccina was retained by the district. Neither the order of remand for a hearing on the merits nor the subsequent request for dismissal conclusively demonstrates Baccoccina's status during and after the mandamus proceedings. The record indicates that the remand order and subsequent request for dismissal were both filed *before* the filing of the trial court's findings and conclusions, thus the inference of a finding in favor of respondents is appropriate. Moreover, even if there were evidence after judgment in the present case that Baccoccina had been retained, the matter would not be reviewable on this appeal, but would more appropriately be dealt with in subsequent litigation in the trial court. (See *In re Marriage of Folb* (1975) 53 Cal.App.3d 862, 877 [126 Cal.Rptr. 306]; disapproved on another point in *In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 749, fn. 5 [131 Cal.Rptr. 873, 552 P.2d 1169]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 220, at pp. 4210-4211.)

The judgment is reversed to the extent that the trial court failed to grant the former children's center employees seniority credit for such service, and is affirmed in all other respects. The cause is remanded for further proceedings consistent with this opinion.

Low, P. J., and Haning, J., concurred.

A petition for a rehearing was denied July 27, 1983, and appellants' petition for a hearing by the Supreme Court was denied August 24, 1983.